UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPHINE M. MALDONADO,
     Plaintiff

v.

CHASE HOME FINANCE, LLC,
     Defendant

Case No. 1:10-cv-10862-DPW

**PLAINTIFF JOSEPHINE MALDONADO'S OPPOSITION
TO DEFENDANT CHASE'S MOTION TO DISMISS**

### Introduction

Josephine Maldondo filed suit against Chase Home Finance, LLC, after it ignored her loan modification application under the Home Affordable Modification Program, ignored her request under the Truth in Lending Act for the identity of the investor of her mortgage, and, finally, ignored her demand letter under the Massachusetts Consumer Protection Act. Chase now attempts to ignore her for a fourth time, and has moved to dismiss her complaint.

Chase's arguments are full of sound and fury, but ultimately founder. The Consumer Protection Act provides plaintiffs with a private right of action for any unfair or deceptive acts committed against them in violation of, among other things, federal consumer protection laws like that which created the HAMP program. The HAMP program explicitly provides that servicers must be in compliance with state laws such as the Consumer Protection Act.  And Chase's arguments against TILA liability also fail because mortgage servicers are liable under common law agency principles, as well as under First Circuit precedent, for TILA violations.

1

I.      **Statement of Facts — Chase Ignored Maldonado's Request for Evaluation Under HAMP, Ignored Her TILA § 1641(f) Request, and Then Ignored Her 93A Demand.**

Plaintiff is Ms. Josephine Maldonado ("Maldonado"), who resides in Methuen, Essex County, Massachusetts. She bought her home on for $380,000 on July 31, 2006. To finance her purchase she used two loans from JPMorgan Chase Bank, N.A. in the amounts of $304,000 and $76,000, secured by two mortgages in favor the same. Chase Home Finance, LLC ("Chase") is what is called the servicer of Maldonado's mortgage. Compl. ¶ 9. The facts in this case stem from Maldonado's attempt to modify her mortgage under the federal Home Affordable Modification Program ("HAMP"), and to obtain the identity of the owner of her mortgage under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. ("TILA").

The U.S. Department of the Treasury established a foreclosure-prevention program in 2009 pursuant to the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009. The formers states that Treasury "shall implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages . . . to minimize foreclosures." This foreclosure-prevention program is called the Home Affordable Modification Program. HAMP's purpose is to avert the foreclosure crisis in the United States by modifying the terms of mortgages of the owners of residential property. Compl. ¶¶ 14-16. HAMP accomplishes this by evaluating residential homeowners for loan modifications that will lower their interest rates, thus lowering their monthly mortgage payments, thereby allowing them to remain in their homes. *Id.*

HAMP has been implemented as a series of loan-servicing instructions promulgated by the U.S. Department of the Treasury that include what are called "supplemental directives." These supplemental directives are incorporated by reference into the servicing instructions Defendant is obligated to follow under its Servicer Participation Agreement. Compl. ¶¶ 17-18.

On January 22, 2010 Maldonado sent a request for the identity of the owner of her mortgage to Chase pursuant to the Truth in Lending Act, 15 U.S.C. § 1641(f). Compl. ¶ 35. Chase did not respond and failed to provide this information. Compl. ¶ 36.

On February 13, 2010, because of financial difficulties, Maldonado submitted a package of financial materials to Chase , requesting a loan modification under the HAMP. Compl. ¶ 23. HAMP guidelines required Chase to acknowledge Maldonado's loan modification request within 10 business days. Compl. ¶ 25. Maldonado received no such acknowledgement from Chase. Compl. ¶ 25. HAMP guidelines also required Chase to provide a written loan modification offer or denial within 30 days. Compl. ¶ 25. Chase failed to do this, as well. Compl. ¶ 25.

Because she received no response to her requests, Maldonado mailed a demand for relief to Chase pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 9, by counsel. Compl. ¶ 27. A copy of the demand letter was attached to the Complaint as its Exhibit C. Despite receiving the demand via certified mail, Compl. ¶ 28, Chase did not make a reasonable offer of settlement—in fact, it refused to respond at all and ignored Maldonado's lawful correspondence. Compl. ¶ 29.

So, after she was repeatedly ignored by Chase, and despite her request to resolve the dispute outside of litigation, Maldonado was left with no option but to file this suit.

## II.   Standard for a Rule 12(b)(6) Motion to Dismiss — A Liberal Pleading Standard Requiring Consideration of the Allegations of the Complaint.

The purpose of a motion under Fed. R. Civ. P. 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case. *Killela v. Hall*, 84 F. Supp. 2d 204 (D. Mass. 2000). Thus, it must be read in conjunction with Fed. R. Civ.

P. 8(a), which sets forth the requirements for pleading a claim for relief in federal court and calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." Only when the plaintiff's complaint fails to meet this liberal pleading standard is it subject to dismissal under Fed. R. Civ. P. 12(b)(6).

The short and plain statement of fact required by Fed. R. Civ. P. 8(a)(2) must simply "possess enough heft to show that the pleader is entitled to relief, meaning that "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). There must be enough detail to "nudge [a] claim across the line from the [merely] conceivable" to what is permissibly "plausible." *Id.*

In determining whether to grant a motion to dismiss, a court is not limited to the four corners of the complaint. Matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, items appearing in the record of the case, and exhibits attached to the complaint may be considered. *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10 (1st Cir. 2009).

## III.    Law and Analysis: Maldonado's 93A Claim

Chase's motion to dismiss Maldonado's 93A claim fails for four reasons: (1) 93A provides a private right for violation of all federal laws that protect consumers, regardless of whether those laws have their own remedial provisions, pursuant to 940 Code Mass. Regs. § 3.16(c); (2) HAMP regulations explicitly **permit** state-law claims for mortgage servicers' violations of HAMP guidelines; (3) Chase's motion attacks a straw man by misconstruing Maldonado's 93A claim as being grounded in breach of contract, due process, and other theories; and (4) Maldonado's damages, economic and non-economic, are alleged with sufficient specificity for a 93A claim. These arguments are explained in detail below.

### A.  93A Provides a Private Right for Violation of HAMP and Other Federal Consumer Protection Laws.

Chase, despite its protestations, is not above the law. It is prohibited under the Massachusetts Consumer Protection Act ("93A") from committing unfair or deceptive acts or practices. As is shown below, violation of HAMP guidelines, such as those violated by Chase, which were created under the auspices of a federal consumer protection act, is a violation of 93A.

Chapter 93A seeks to ensure an equitable relationship between consumers and businesses by protecting consumers from "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). The statute charges the Attorney General of the Commonwealth with promulgating rules and regulations defining "unfair and deceptive acts." Mass. Gen. Laws ch. 93A, § 2(c).

Pursuant to this power, the Attorney General has issued 940 Code Mass. Regs. § 3.16(c), which states that an act or practice is unlawful if "It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or **other Federal consumer protection statutes** . . . ." (emphasis added). Chapter 93A gives consumers a private right of action under state law regardless of whether the federal consumer protection statute provides a remedy. This is a bedrock principle of 93A.

A practice may be deemed unfair if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975).

These standards for unfairness can come from any number of sources. *See Massachusetts v. Fremont Inv. & Loan*, 897 N.E.2d 548 (Mass. 2008) (citing warnings about predatory lending

in numerous industry advisory letters as indications of unfairness and deception, from the Office of the Comptroller of the Currency, the FDIC, and the Office of Thrift Supervision).

A mortgage servicer's failure to follow foreclosure-prevention guidelines is unquestionably a violation of 93A. *Joseph L. Hart v. Gmac* (*In re Hart*), 246 B.R. 709 (Bankr. D. Mass. 2000). In that case, based on the defendant mortgage servicer's breach of a forbearance agreement and initiation of foreclosure proceedings, which breach was in violation of Fannie Mae servicing guidelines intended to prevent foreclosure, that court held that "Not only did [the servicer's] actions constitute an unfair trade practice, they violated Fannie Mae's own servicing guidelines, which encouraged the avoidance of foreclosure and the implementation of management review procedures for evaluating decisions to foreclose." *Id.* at 735. This decision is also consistent with the 93A prohibition on unfairness or deceptiveness, since unfair or deceptive mortgage servicing is a per se violation of 93A pursuant to 209 C.M.R. § 18.21 ("A third party loan servicer may not use unfair or unconscionable means in servicing any loan.").

Furthermore, violations of FTC guidelines, although they have no federal enforcement mechanism for private consumers, are nonetheless considered violations of 93A and are actionable under state law. *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303 (Mass. 2002) (indirect purchasers of consumer products may bring an action under 93A against manufacturers and distributors of those products for price-fixing and other anti-competitive conduct in violation of the Federal Trade Commission Act); *Datacomm Interface, Inc. v. Computerworld, Inc.*, 489 N.E.2d 185, 196 (Mass. 1986) (stating "Although [93A] does not itself define what constitutes an unfair act or practice made unlawful by § 2(a), . . . courts are to be guided by the interpretation given to those terms by the Federal Trade Commission (FTC) under the Federal Trade Commission Act . . . .").

The above examples are consistent with the reading 93A as prohibiting any act or practice that is "unfair," i.e., that is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Vieira v. First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 292 (D. Mass. 2009) (Woodlock, J.) (*quoting Morrison v. Toys 'R' Us, Inc.,* 441 Mass. 451, 806 N.E.2d 388, 392 (2004)).

U.S. Department of the Treasury established HAMP pursuant to consumer-protection acts—Emergency Economic Stabilization Act of 2008 ("EESA") and the American Recovery and Reinvestment Act of 2009 ("ARRA"). EESA § 2 describes the purposes of that act and states that it is intended to "protect home values" and to "preserve[] homeownership". EESA § 109, as amended by ARRA § 7002, states:

> [T]he Secretary shall implement a plan that seeks to **maximize assistance for homeowners** and use the authority of the Secretary to encourage the servicers of the underlying mortgages . . . to **minimize foreclosures**. In addition, the Secretary may use loan guarantees and credit enhancements to facilitate loan modifications to **prevent avoidable foreclosures**.

(Emphases added.) Furthermore, ARRA § 3 describes that one of its purposes is to "assist those most impacted by the recession." EESA § 125 requires a special panel to analyze the act's effect on "**protecting consumers** . . . and whether there are any gaps in existing **consumer protections**" (emphasis added). All of the above leave no doubt that the purpose of the acts creating HAMP, EESA and ARRA, are consumer-protection acts.

Here, where Maldonado alleges violations of guidelines issued by Treasury related to the HAMP program, it is certain that Chase committed unfair and deceptive trade practices, violating 93A. Maldonado specifically alleges that Chase violated HAMP Supplemental Directive 09-07, Compl. ¶ 25, by failing to consider her February 13, 2010 application for a loan modification

under the HAMP guidelines. Compl. ¶ 26. Finding a violation in Maldonado's case would be completely consistent with the plain meaning of 93A's prohibition on unfair and deceptive trade practices, as well as with precedent in the District of Massachusetts.

**B.  HAMP Explicitly Encourages State-Law Claims for Mortgage Servicers' Violations of HAMP Guidelines.**

Chase argues against the plain textual meaning of the guidelines it is required to follow. Freddie Mac is not the only entity that can enforce HAMP regulations. HAMP Supplemental Directive 09-01, p.12 ("Supp. Dir. 09-01") (attached in part as **Exhibit A**), the very first supplemental directive issued by Treasury, states in no uncertain terms that mortgage servicers are required to follow state laws, and that HAMP does not create a right without a remedy.

Specifically, Supp. Dir. 09-01 states that <u>**servicers must comply with all state laws, without limitation**</u>, and including other federal consumer-protection acts that do provide remedies such as the Federal Trade Commission Act (which prohibits unfair and deceptive practices) and the Fair Debt Collection Practices Act. This supplemental directive states:

> **Each servicer (and any subservicer it uses) must be aware of, and in full compliance with, all federal, state, and local laws** (including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions) – including, but not limited to, the following laws that apply to any of its practices related to the HAMP:
> - Section 5 of the Federal Trade Commission Act, **which prohibits unfair or deceptive acts or practices**.
> - The Equal Credit Opportunity Act and Fair Housing Act, . . . .
> - The Real Estate Settlement Procedures Act, . . . .
> - The Fair Debt Collection Practices Act, . . . .

(Emphases added.) It is beyond dispute that there is no private right of action under state law for violations of HAMP.

Furthermore, in Chase's own contract with Treasury (attached in part as **Exhibit B**, at p.B-3) it made promises to comply with "**all applicable Federal, state and local laws**, regulations, regulatory guidance, statutes, ordinances, codes and requirements . . . and all applicable laws . . . ." (emphasis added).

To show any exemption from 93A, a defendant must show that a statutory or regulatory affirmatively permits the practice which is alleged to be unfair or deceptive. *Fleming v. National Union Fire Ins. Co.*, 837 N.E.2d 1113, 1121 (2005) (internal citation omitted). Therefore, if Chase wishes to show that it is exempt from 93A with respect to HAMP, it must show an exemption—but Chase cannot, since HAMP explicitly prohibits the conduct Chase engaged in (unfair and deceptive conduct). Chase's argument is misguided and reveals a further lack of familiarity with the guidelines it is contractually obligated to follow.

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law . . . . This is but an application of the maxim, Ubi jus ibi remedium." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 367 (1991) (Scalia, J.) (quoting the unanimous decision in *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, at 39-40 (1916)).

### C.  Chase's Motion Attacks a Straw Man by Misstating Maldonado's Position as Being Grounded in Other Causes of Actions Besides 93A.

Chase's argument invites the critique of "more matter, less art," going to great lengths to avoid the question of whether 93A applies by misstating the basis Maldonado's lawsuit as, alternately, claims for due process violations (Mot. to Dismiss, p.4), third-party breach of contract (Mot. to Dismiss, p.4), and the California Business and Professions Code (Mot. to

Dismiss, pp.3, 4). Chase's argument also attempts to portray Maldonado's claim as being grounded in some private right of action under the Emergency Economic Stabilization Act of 2008 or the Troubled Assets Relief Program. (Mot. to Dismiss, p.11-12).

These arguments have no bearing on whether the law of 93A applies. Chase's arguments are red herrings intended to distract the court from the true issue—whether 93A itself provides a private right of action for unfair or deceptive acts or practices committed in the Commonwealth of Massachusetts. As shown in the previous sections, violation of a federal law that is intended to protect consumers, as the HAMP program obviously is, is a violation of 93A.

The "broad new rights" created by 93A include the ability to obtain relief under 93A without privity of contract. *Kattar v. Demoulas* at 258. ("Parties need not be in privity for their actions to come within the reach of c. 93A."). There is a contract between Chase and Treasury under which Chase promised to follow the supplemental directives with respect to Maldonado. Compl. ¶ 17. There is clearly a relationship between Chase and Maldonado, since Chase is the servicer of her mortgage. Compl. ¶ 9. This satisfies the requirement under 93A there should be some relationship between the plaintiff and the defendant. *Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 57 (2004). Chase cannot escape liability by relying on irrelevant string citations and attacking straw men.

### D.  Maldonado Alleged Specific Injury by Chase, Although 93A Does Not Require Allegation of Economic Injury.

Chase also argues that Maldonado has failed to claim any damage from its actions. This would be incorrect. Maldonado specifically alleged that she suffered actual damages by not being considered for a loan modification, and by having her home put in imminent danger of foreclosure. Compl. ¶ 30. Also attached to her complaint was her Exhibit C, which described in

detail her efforts to obtain the modification, as well as her damages of being timely evaluated for a loan modification under HAMP. (Compl. Ex. C, pp.3-4.) This was an economic injury to Maldonado because she could have paid a lower interest rate had her loan been timely modified. Moreover, even if economic injury were not alleged at all, there is no requirement under 93A that economic injury be alleged. All that need be alleged is "injury," which allegation Chase does not dispute. In 1979, the requirement that a plaintiff show a loss of "money or property" to state a claim under 93A was removed and replaced with "injury." Under Section 9, the term "injury" denotes the invasion of any legally protected interest of another. *Leardi v. Brown*, 474 N.E.2d 1094, 1101 (Mass. 1985).

"Injury" usually involves the infliction of some harm, resulting in a loss or damage, but there may be an injury without such harm. *Id*. Thus, damages may be recoverable even though the plaintiff has not actually sustained a monetary loss. In *Leardi v. Brown*, damages were recovered where a landlord included an unlawful provision in a printed lease form but never attempted to enforce the unlawful provision against the plaintiff. Under circumstances where there has been an invasion of a legally protected interest but no harm for which actual damages can be awarded, the statute provides for the recovery of minimum damages in the amount of $25. *Id*. The Supreme Judicial Court recently reaffirmed the language in Leardi, indicating that the term "injury," in the context of Chapter 93A, denotes "an invasion of a legally protectable interest." *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 490 (Mass. 2004).

Furthermore, Chase's claim that "Chase is expressly prohibited" from foreclosing on Maldonado is untrue, or at least unpersuasive, since **Chase has already initiated foreclosure of Maldonado's home**—apparently in another violation of its duties. (**Exhibit C**, notice from

Chase's attorneys at Orlans Moran, PLLC stating "We have been instructed by Chase Home

Finance, LLC to institute foreclosure proceedings on the Mortgage.").

Therefore, because Maldonado has claimed to be injured by "not being considered for a

loan modification" and "having her home put in imminent danger of foreclosure," Compl. ¶ 30,

she has stated a proper claim under 93A.

IV.    **Law and Analysis: Maldonado's TILA Claim**

Maldonado's TILA claim withstands Chase's motion to dismiss for two reasons: (1)

mortgage servicers are liable under common law as agents of the creditors; and (2) First Circuit

precedent requires construing any discrepancies in light of the overall purpose of the statute—

here, that purpose is consumer protection under the Helping Families Save Their Homes Act of

2009. These are explained in detail below.

### A. Servicers are Liable Under Common Law for TILA Violations as Agents of the Creditor.

Chase is also not exempt from the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

("TILA"). Servicers are required under TILA § 1641(f)(2) to tell borrowers upon request who

owns their mortgages, i.e., who the creditors are.[1] The penalty for a creditor's failure to provide

this information is up to $4,000 in statutory damages. Since the identity of the creditor is the

information a homeowner would be seeking in this request, the homeowner would need to

request the information from their mortgage servicer.

---

[1] This information is usually disguised because the mortgage servicer is not the entity that owns
the mortgage, but rather acts on behalf of the creditor. *Consumer Solutions REO, LLC v. Hillery*,
No. 111, 2010 WL 1222739 (N.D. Cal. Mar. 24, 2010).

The servicer *qua* servicer might not be liable under TILA, but the servicer is undoubtedly liable as an agent of the creditor under common-law agency principles. *See Boynton v. Buchanan*, 429 N.E.2d 365, 367 (Mass. App. Ct. 1981) (holding that a defendant's status as an agent "does not insulate him from liability") (citing REST 2d AGEN § 343, "An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal . . . ."). Here, Chase is liable as an agent of its principal for failure to provide the identity of the owners of Maldonado's mortgage.

It has been decided that a servicer is liable based on an agency relationship under TILA, and that agency principles must be implied under § 1641(f)(2). *Roach v. Option One Mortgage Corp.*, 598 F.Supp.2d 741, 753 (E.D. Va. 2009); *Bank One, N.A. v. Bumpers* (*In re Bumpers*), No. 03 C 111, 2003 WL 22119929 (N.D. Ill. Sept. 11, 2003) (assuming that agency principles applied, although the facts in that particular case did not allow the inference of such a relationship).

This is simply the application of the black-letter principle that an agent acting on behalf of an undisclosed principal is individually liable for its actions. *Groce v. First Nat'l Stores*, 167 N.E. 308, 310 (Mass. 1929) ("As between himself and the other party, the agent of the undisclosed principal has the same rights and is subject to the same obligations as if he had not been acting for another."); *Amory v. Checroune*, 2004 Mass. App. Div. 12, Not Reported in N.E.2d, 2004 WL 120096 (holding agent individually liable due to his initial failure to disclose his principal).

Maldonado sufficiently pleaded a TILA violation because a servicer is, by law, an agent of the borrower's creditor. The principle has been repeatedly upheld that an agent, (e.g., a mortgage servicer) is not relieved from liability for its acts simply because it acted on account of

the principal or at its command. *Orell v. UMass Mem'l Med. Ctr., Inc.*, 203 F. Supp. 2d 52 (D. Mass. 2002) (citing REST 2d of AGEN § 343).

There are three essential characteristics of an agency relationship: (1) the power of the agent to alter the legal relationships between the principal and third parties and between the principal and himself; (2) the continuous right by the principal to control the conduct of the agent with respect to matters which are within the scope of the agency; and (3) the existence of a fiduciary obligation owed by the agent to the principal with respect to matters within the scope of the agency. *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135 (D. Mass. 1990); *Canney v. City of Chelsea*, 925 F. Supp. 58 (D. Mass. 1996) (applying Massachusetts law); *Thornton v. Harvard University*, 2 F. Supp. 2d 89 (D. Mass. 1998) (applying Massachusetts law).

The statutory definition of "servicer" in TILA is incorporated by reference from the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(2) which states: "The term 'servicer' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." This definition is further elaborated on in the companion section of the Federal Register, which states:

> Servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms of any mortgage loan, including amounts for escrow accounts . . . and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract.

24 C.F.R. § 3500.2.

Under the legal definitions of "agency" and the statutory definition of "servicing," a servicer is an agent of the servicer. First, servicers are able to modify legal relationships between the principal-creditor and third parties. For instance, loan modification agreements are executed not by the creditor, but by the servicer on behalf of the creditor without disclosing the creditor's

identity. *See*, e.g., HFSTHA § 201, 123 Stat. 1638-39 (recognizing the servicer's fiduciary duty to the creditor, and providing safe harbor to perform modifications of loans owned by creditors).

Second, the principal controls the agent with respect to matters within the scope of the agency under what is called a servicing agreement, the legal document defining an agent's obligations and responsibilities to the creditor. *See*, e.g., Fannie Mae Single-Family Servicing Contract, Part V, Section A (stating that the servicer "[w]ill diligently perform all duties that are necessary or incident to the servicing of . . . all mortgages it is servicing for us . . . ."), available online at http://www.allregs.com/tpl/public/fnma_freesiteconv_tll.aspx.

Third and finally, the servicer has a fiduciary relationship to the principal, as recognized in 24 C.F.R. § 3500.2, which states that the servicer has a duty to "mak[e] the payments to the owner of the loan . . . ." *See also* 15 U.S.C. §1639a(a)(1) ("to the extent that the servicer owes a duty to investors or other parties to maximize the net present value of such mortgages, the duty shall be construed to apply to all such investors . . . .").

A servicer such as Chase receives payments, sends monthly statements, conducts collection activity, and so forth, all in its own name, 24 C.F.R. § 3500.2, while concealing the identity of the owner of the obligation. Chase collected payments from Maldonado, and it is the entity to which she still makes her payments today. In virtually every instance, including the present case, the servicer is the only entity with which the borrower has contact, leading most laypersons believe that their servicer, or their "mortgage company," is the entity that owns their mortgage. This is the reason, of course, that Maldonado's request for the identity of her mortgage servicer had to be sent to Chase.

So, a servicer is, by law, an agent of the creditor. After all, if Chase were not an agent, what right would it have to receive payments from a borrower, and to conduct foreclosures and

collection activity, and sign loan modification contracts in the creditor's name? And as an
agent/servicer, Chase is liable for violation of TILA § 1641(f). This is the only reasonable
interpretation because TILA § 1641(f) creates an obligation on the part of the servicer—not the
creditor—to provide the borrower with the contact information for the creditor. An interpretation
that discounted the case law on agency under TILA.

### B.  First Circuit Precedent Requires Construing TILA in Light of the Overall Purpose of the Statute.

Were Chase's circular reading of the TILA to succeed, an Act of Congress would be
rendered meaningless—that is, if borrowers wanted to request the identity of their mortgage's
owner, they would need to request it from the same entity, the mortgage's owner. The borrower
would have to already be in possession of the information requested. This makes no sense.
Chase's logic ignores the only sensible interpretation of TILA § 1640, which is that borrowers
must request this information from the servicer of their mortgage, the only mutual point of
contact a borrower may ever have with their mortgages' owners, and that servicers must be liable
for failure to provide it. This interpretation does not even require construing TILA "liberally in
favor of the consumer," *Hauk v. JP Morgan Chase Bank United States*, 552 F.3d 1114 (9th Cir.
2009), but simply asks for a common-sense reading of the statute and a basic understanding of
the law of agency and the rules of statutory construction.

In the First Circuit, where there is any doubt as to their meaning, amendments to TILA
must be construed in light of the purpose of the overall statute of which those amendments are a
part. *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 423 (1st Cir. 2007). Here, the
relevant TILA amendment under the Helping Families Save Their Homes Act of 2009
("HFSTHA") was intended to expand liability of servicers and ensure that homeowners were

provided with the contact information of the creditors that owned their mortgages. HFSTHA §

404 creates additional requirements for servicers, such as disclosing the identity and contact

information for a new creditor any time that the mortgage is assigned or transferred, showing that

HFSTHA's intent is additional servicer liability for statutory violations.

So, it would be consistent with the intention of the amendment to ensure liability for

servicers who fail to provide the information required under TILA § 1641(f). Moreover, where

interpretation of TILA would allow a windfall, TILA should be interpreted so as to do justice.

*Melfi v. WMC Mortgage Corp.*, 568 F.3d 309, 313 (1st Cir. 2009) ("[T]he TILA amendments

were aimed in general to guard against widespread rescissions for minor violations"). If Chase

were allowed to shirk its obligation to provide this information, it would not only deprive

Maldonado of a remedy where there had been a wrong, but would be a windfall to Chase, as

servicers would effectively no longer have to provide this information to homeowners.

This interpretation is further reinforced by the general rule that remedial laws such as

TILA designed to protect consumers should be construed to do so. *Hauk v. JP Morgan Chase*

*Bank United States*, 552 F.3d 1114 at 1117 ("To effectuate TILA's purpose, a court must

construe 'the Act's provisions liberally in favor of the consumer' and require absolute

compliance by creditors."); *Rand Corp. v. Yer Song Moua*, 559 F.3d 842, 845 (8th Cir. 2009)

("TILA . . . was passed by Congress as a consumer protection act, and its provisions, as well as

Regulation Z, are remedial legislation, to be construed broadly in favor of consumers."); *Roberts*

*v. Fleet Bank*, 342 F.3d 260, 266 (3d Cir. 2003) ("As the TILA is a remedial consumer protection

statute, we have held it should be construed liberally in favor of the consumer.") (internal

quotation marks omitted); *Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998)

("We have repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer.").

The above canon of statutory construction appears particularly appropriate considering the importance of providing borrowers with information about the current lender under TILA § 1641(f)(2) in the increasingly prevalent context of mortgage servicing, where the identity of the lender may be difficult to ascertain. Absent any indication of Congressional intent to the contrary, agency principles simply must apply to TILA § 1641(f)(2). The statute would otherwise be meaningless. *See*, e.g., *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979) ("[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used"); *Gulf Life Ins. Co. v. Arnold*, 809 F.2d 1520, 1524 (11th Cir. 1987) ("Absent clear congressional intent to the contrary, we will assume the legislature did not intend to pass vain or meaningless legislation").

## V.    <u>Conclusion</u>

For the above stated reasons, Maldonado has a private right of action to sue Chase under 93A for violation HAMP guidelines, and Chase is liable under TILA § 1640 as an agent of its undisclosed principal, the owner of Maldonado's mortgage.

Respectfully submitted,

Plaintiff,
Josephine Maldonado,
By counsel,

/s/*Josef Culik*
Josef Culik (BBO #672665)
Culik Law P.C.
100 Cummings Center
Suite 425G
Beverly, MA 01915
Tel:  978-910-0248
Fax:  978-910-0247
josef@culiklaw.com

Dated: August 19, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 19, 2010.

/s/*Josef Culik*
Josef Culik